IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EDWARD EARL DENTON,<br><br><br><br>Debtor. | Chapter 7<br><br>Case No. 06-02073-SSC<br><br>Adv. No. 06-ap-00922 |
| RONNA J. ROBERTSON,<br><br>Plaintiff,<br><br>v.<br><br>EDWARD EARL DENTON,<br><br>Defendant. | (Not for Publication- Electronic Docketing ONLY)<br><br>MEMORANDUM DECISION |

I. INTRODUCTION

      Ronna J. Roberston, the Plaintiff, filed her complaint against the Debtor, Edward Earl Denton on October 26, 2006.  In the Complaint, the Plaintiff alleged a number of grounds which, she believed, supported a judgment that the debt due and owing to her by the Debtor should be non-dischargeable.  The Court conducted numerous pre-trial proceedings in this matter over a prolonged period of time, and held a four-day trial during 2008.[1]  The parties filed their

---

**1.**  The proceedings were protracted because the Plaintiff and the Debtor, a former California attorney who ultimately surrendered his license, proceeded without the assistance of counsel.  At times, the Plaintiff requested continuances for a variety of reasons concerning problems with discovery.  At other times, the Debtor requested continuances because of health issues.  Ultimately, the Court conducted a trial on the issues presented on January 9, March 18,

1

post-trial memoranda of law, and thereafter this matter was deemed under advisement.[2]  This

decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P.

52, Bankr.R.7052.  The Court has jurisdiction over this matter, and this is a core proceedings.  28

U.S.C. §§1334 and 157. (West 2008).


## II.  FACTUAL BACKGROUND

A.  The Testimony of Ms. Alexandra Robertson - January 9 and March 18, 2008

   The Plaintiff chose to call her sister, Ms. Alexandra Robertson, as her first

witness.  Ms. Robertson's testimony was, at times, disjointed, and she had less information about

what occurred than her sister, the Plaintiff.

   Ms. Robertson testified that she, the Plaintiff, another sister, and their mother

were the original owners, as joint tenants, of the real property ("Property") located at 318

Georgia Circle, Placentia, California.  She was not sure of the down payment made by her family

initially to acquire the Property, but she confirmed that they required financing and that they

executed a promissory note and deed of trust as part of the consideration to purchase the

Property.[3]  Her sister, Adrianna Robertson, died in 1994.  Her mother, also the mother of the

Plaintiff, died in 1999.

   By early 2000, the deceased mother was still listed as an owner of the Property,

along with Ms. Robertson and the Plaintiff.  The first mortgage lien on the Property was then

held by Transworld Mortgage Corporation ("TMC").[4]  On May 16, 2000, TMC transferred the

servicing on the loan transaction with the Plaintiff and Ms. Robertson to Alliance Mortgage

---

and September 9 and 10, 2008.

 **2.**  The post-trial memoranda of law were filed on October 8, 2008.

 **3.**  Exhibits 1, 2, and 3.

 **4.**  Exhibit 9.

2

1 Company ("Alliance"). However, no other changes were made to the loan documentation.[5] Ms.

2 Robertson also testified that in 1998, the Robertsons had placed a second mortgage lien on the

3 Property and had duly executed a promissory note and deed of trust in favor of City Financial.[6]

4       Although Ms. Robertson did not have financial expertise and relied on the

5 Plaintiff to make the mortgage payments on the Property, Ms. Robertson confirmed that in

6 October of 2000, she was aware that foreclosure proceedings had been commenced as to the

7 Property.[7] She testified that she was confused by one notice that was sent to her and the Plaintiff

8 by TD Service Company notifying her of a trustee's sale on the Property by November 15,

9 2000.[8] She did not recognize the name of Lenders TD Service, and she noted that there was an

10 error in the legal address for the Property.

11       Because of the impending trustee's sale of the Property, she requested that the

12 Plaintiff retain an attorney to assist them. Although Ms. Robertson testified that she did not

13 "retain" an attorney, it is clear that she and her sister met with Edward Earl Denton ("Debtor")

14 and that she relied on the Debtor to assist her with her legal issues. She recalled a meeting with

15 the Debtor just prior to the trustee's sale on the Property. She did not remember executing a

16 promissory note or a deed of trust at the time, and she believed that she had completed only part

17 of an application to obtain some type of new financing to cure the defaults that her secured

18 lenders had alleged as to the Property.[9] Ms. Robertson also recalled that at the meeting with the

19 _____

20    **5.** Exhibit 10.

21    **6.** Exhibits 16 and 17.

22    **7.** Ms. Robertson testified that she had never seen Exhibit 9, which reflects the initial

23 notice sent by TMC, as servicer, to proceed with a non-judicial foreclosure sale of the Property.
She was also unfamiliar with Exhibit 12, the June 16, 2000 Notice of Default by Alliance, as

24 servicer, which was recorded against the Property.

25    **8.** Exhibit 22.

26

27    **9.** For instance, she testified that although she signed Exhibit 41, the liabilities of
Alliance and City Financial were added by someone else. Specifically she could not confirm the

28

1 Debtor, just prior to the trustee's sale, the Debtor told her that he intended to refer her and the

2 Plaintiff to a Mr. Jeffrey Prather for the refinancing. Ms. Robertson was adamant that the

3 Debtor referred to Mr. Prather as his "good friend." Ms. Robertson was also certain that the

4 Debtor advised her and the Plaintiff that although Mr. Prather was providing new financing to

5 protect the Property from any type of foreclosure sale, the Debtor intended to represent Ms.

6 Robertson and the Plaintiff in "pursuing legal issues" concerning the Property.

7 When Ms. Robertson continued her trial testimony on March 18, 2008, she stated

8 that she first met with the Debtor, at his office, on November 13, 2000. The Court believes that

9 the initial meeting with the Debtor actually occurred earlier in November. For instance, the

10 retainer agreement was executed by the Plaintiff on November 1, 2000, and Ms. Robertson

11 placed a date of November 1, 2000 on the loan application that she executed. Moreover, since

12 the trustee's sale of the Property was scheduled on November 15, 2000, and the initial financing

13 was unable to be effectuated by the Debtor, with back-up financing later obtained by the Debtor,

14 it is unlikely that these efforts to obtain the financing occurred in one or two days. In any event,

15 the Court concludes that Ms. Robertson did attend one meeting at which the Plaintiff and the

16 Debtor were present and that occurred in early November 2000.

17 At the meeting at which the Robertsons were present, the Debtor discussed the

18 various options that the Plaintiff and Ms. Robertson might pursue. They could, for instance,

19 obtain refinancing, to satisfy the defaults concerning the secured loans on the Property. The

20 sisters Robertson would need to fill out applications and other loan documentation to obtain the

21 refinancing. Ms. Robertson testified that she remembered filling out the American Home Loan

22 Application during the November meeting with the Debtor.[10] She stated, however, in reviewing

23 the application that it had been completed by someone else, since there was unidentifiable

24

25 accuracy of the items listed as liabilities, including taxes and Home Owner Association fees, in

26 the aggregate amount of $1,444.46.

27 **10.** Exhibit B.

28 4

handwriting on the application that she reviewed during her testimony.[11]  However, she did execute the loan application.  She conceded that at the time of the meeting, she knew that "back taxes" were owing on the Property.

Ms. Robertson also testified that the Debtor discussed the issues raised by having the deceased mother of the Plaintiff and Ms. Robertson still listed of record as having an interest in the Property although the mother had died in January 1999.  Ms. Robertson noted that when her sister, Adrianna, had died in 1994, she was also a borrower under one of the loans and recalled that when the Plaintiff and Ms. Robertson requested a loan from City Financial in 1998, to pay real estate taxes on the Property, they encountered problems obtaining financing because of Ms. Adrianna Robertson's death.  They had to provide proof of the sister's death to remove her from the first lien that was to remain on the Property.  Ms. Robertson also recalled that someone had pursued her for the payment of estate taxes concerning the sister's death.  Ms. Robertson wanted to ensure that a removal of her mother's name from the title on the Property would not engender the same problems.  The Debtor assured her that the process was straight-forward.

Ms. Robertson testified that the Debtor advised her at the November meeting that he was encountering difficulties in obtaining the consent of Mr. Rose, the principal of City Financial, to any refinancing of the secured debt that encumbered the Property, because the Plaintiff had made numerous calls to Mr. Rose's office, which Mr. Rose deemed, at best, a nuisance, and, at worse, threatening.  The Debtor apparently told Ms. Robertson that he was unable to obtain consent to the refinancing through Mr. Rose because of the Plaintiff's actions.  The Debtor stated that any financing to be obtained would need to pay the then lienholders

**11.**  For instance, she testified that the Zip Code, legal description, term "N/A," "spa and shutters" "upgrade to yard" were added by someone else on Page 1 of the application, and that the amount of her liabilities to Alliance and City Financial and the total of her liabilities had been added by someone else on Page 2 of the same document. She stated that the handwriting "282k" on Page 2 had been inserted by her.

5

against the Property, including City Financial controlled by Mr. Rose, in full.  She testified that the Debtor had located a Mr. Jeffrey Prather who would provide the financing that would bring their real estate taxes current and pay the first and second lienholders on the Property, Alliance and City Financial, in full.  She stated that Mr. Prather never told them that the note for their refinancing had been assigned to Old Codgers around January 2001.[12]

On January 19, 2001, she had her last meeting with the Debtor.  Ms. Robertson testified that she and the Plaintiff arrived at the Debtor's office to seek assistance concerning a recent telephone call that the Robertsons had received from a "Mr. Biddle."  Ms. Robertson stated that they had received a call from Mr. Biddle the day before and he had stated that he "was going to haul them into foreclosure."  At the January 19 meeting, Ms. Robertson recalled that when they arrived at the Debtor's office, the Plaintiff was extremely upset about the situation and would not stop talking.  Ms. Robertson testified that the Debtor told the Plaintiff "to sit down and shut up."  After the meeting, she recalled leaving with the Plaintiff.  She had no further contact with the Debtor.

In reviewing the loan history after the refinancing of the Property, the record reflects that the title company on the refinancing, First American Title Insurance, made a series of payments from its own funds to keep the loan obtained through the  refinancing current.[13]

---

**12.** The Court has reviewed the various documents sent to the Robertsons by FHL Financial Group, the entity for which Mr. Prather worked and the entity that apparently arranged the refinancing for the Robertsons.  In comparing Exhibits I-1 and K, the Court notes that FHL utilized different letterheads.  And, of course, one of these Exhibits reflects that the Robertsons were to "pay Old Codgers," since the note for their refinancing had been assigned to that entity.  The difference in the letterheads adds credibility to the Robertsons statements that they were not aware that their refinancing had been assigned, so they continued to make payments to FHL.

**13.** It would appear that First American cured the default under the refinancing, in the amount of $10,580.40, which included 5 payments in the amount of $1,434.38 that had not been made, 5 late charges of $143.44 for a total of $717.20, a property inspection fee of $250, and the trustee's foreclosure fees of $2,441.30.  First American made a series of payments, in the amount of 1,434.38 each, to Old Codgers (*see* Exhibit R-3, loan reinstated by First American on 8/9/01; R-4 $1,434.38 payment on 9/7/01; R-5, $1,434.38 payment on 10/5/01; R-6, $1,434,38 payment

6

However, First American stopped making payments in early 2002, so that in the February 20, 2002 notice of Default, Ms. Robertson and the Plaintiff were in default, under the refinancing, in the amount of $3,424.32.[14] On June 20, 2002, a trustee's sale of the Property occurred.

Ms. Robertson conceded that approximately two months after the trustee's sale of the Property, she received the sum of $72,000, presumably as excess proceeds after the payment by the trustee of all liens against the Property.[15]

B.  The Testimony of Ms. Ronna J. Robertson, the Plaintiff

On September 10, 2008, the Plaintiff testified that she first contacted the Debtor in late October 2000, concerning his representation of her and her sister as to the foreclosure of the Property.  In November 2000, she retained the Debtor and provided him with an initial retainer.  The parties understood that the Debtor would need to work quickly to resolve the dispute with one or more of the secured creditors, since the trustee's sale of the Property was scheduled for November 15, 2000.  In the retention agreement, the Debtor stated that he had received a payment of $1,000 from the Plaintiff, that the retainer was "nonrefundable," and that he would represent the Plaintiff "through to a conclusion of [the] case by entry of a judgment."[16] The Debtor stated that his services would consist of "preparation of all legal documents for court proceedings and/or settlement agreement, conferences, consultations with [the Plaintiff] and accountants, appraisers, actuaries, real estate brokers and other persons necessary to a resolution of any issues raised during the proceedings, telephone conferences, legal research, and

on 11/8/01).

**14.** Exhibit T.

**15.** Ms. Robertson considered this small comfort, since she had been locked out of the Property for a substantial period of time prior to the sale, and all of her personal possessions had been placed in storage and lost before her receipt of the excess proceeds from the trustee's sale of the Property.

**16.** Exhibit A-1.

7

correspondence."[17] The Debtor set forth his hourly rate and that of any paralegal, the cost of the potential charges or expenses, and how he would bill against the retainer. The agreement also provided that the Plaintiff was to pay an additional $1,500 within two weeks of the November 1, 2000 date of the agreement.[18] The evidence reflects that the Robertsons paid the sum of $1,000 and $700 on November 8, 2000; $500 on November 13, 2000; and $500 on November 15, 2000, the day after the new financing was obtained for the Property.[19] Thus, it appears that the Robertsons paid $2,700, although the agreement provided for the payment of $2,500. The Plaintiff was aware that the Debtor would have to act quickly to avoid a trustee's sale of the Property, so the Plaintiff conceded that she knew that the Debtor would initially try to obtain refinancing of the Property to cure any default of the secured creditors and stop the trustee's sale.

Although the Plaintiff insisted, at the trial, that she believed that the Debtor would proceed immediately with the filing of a lawsuit against the secured creditors, and potentially other parties, the evidence does not support this testimony. For instance, the Plaintiff and Ms. Robertson apparently both met with the Debtor in early November 2000, to discuss the options of the Robertsons and complete the loan applications for the refinancing of the secured obligations on the Property.[20] The completion of the loan applications by the Robertsons reflects that they understood that the trustee's sale was going to occur in a very short period of time and that they needed to complete the loan applications to obtain the refinancing of the secured obligations on the Property. The Plaintiff's loan application lists substantial secured obligations to Alliance and City Financial and outstanding credit card debt to a number of companies. The total amount of the listed secured and unsecured obligations was $109,820. Although the

---

**17.** Id.

**18.** Id.

**19.** Exhibit A-2, A-3, A-4.

**20.** Exhibits B and C.

8

1    Plaintiff was concerned as to what was set forth in the loan application, she did initial each page

2    and execute the document. The Plaintiff understood that the Debtor would initially approach

3    American Home Loan for the refinancing.[21] The Debtor had indicated to her that he had a

4    connection with that financial company. When the Debtor was unable to procure a loan through

5    that entity, he approached Mr. Prather to do the refinancing. The Plaintiff's testimony was

6    consistent with that of Ms. Robertson that the Debtor had represented that he was "friends" with

7    Mr. Prather. The Court concludes that based upon the testimony of the Robertsons and the

8    impending trustee's sale of the Property, what the Debtor did, and additional evidence so

9    supports, was use his connections to have Mr. Prather arrange the refinancing. The Court

10   concludes that the Debtor had an ongoing business relationship with Mr. Prather, although they

11   were not friends. However, as will be set forth hereinafter, Mr. Prather improperly refinanced

12   the debt on the Property, and the Debtor should have known about, and corrected, the problems

13   caused by Mr. Prather.

14

15   C.  The Testimony of Edward E. Denton, the Debtor/Defendant - September 10, 2008

16          The Debtor testified that he used to be a lawyer, admitted to practice in

17   California. However, he encountered certain difficulties in his practice and agreed to surrender

18   his licence voluntarily. The Debtor stated that he has held his California real estate license for

19   thirty years, and that he is still a licensed real estate broker in California. He noted that his area

20   of expertise was in real estate, particularly "real estate foreclosure workouts," or the stopping of

21   foreclosures. The Debtor moved to the Phoenix area, and filed his Chapter 7 petition on July 10,

22   2006.

23          In October 2000, the Debtor was practicing law and was a real estate broker in

24   California. The Plaintiff was referred to the Debtor by an individual in the building where the

25   Debtor practiced law. All of the actions described by him and the Roberstons occurred while all

26

27       **21.** Exhibits D and E.

28                                         9

parties resided in California.

Prior to November 1, 2000, the Debtor testified that he spoke with the Plaintiff over the telephone, obtaining information as to the address of the Property and the entities that had liens against the Property, and setting up a meeting with her. In the interim, the Debtor made independent inquiries as to whether the taxes were paid on the Property, and ordered a property profile of the Property from Fidelity National Title Company.

In early November 2000, the Debtor met with the Plaintiff and Ms. Robertson. At the initial meeting with them, he discussed a number of alternatives, such as bringing the secured obligations on the Property current, obtaining new financing or a refinancing of the liens, and requesting an injunction from a court. The Debtor testified that the Plaintiff assured him that the loans were current and seemed uncertain as to why a trustee's sale had been scheduled in just two weeks or by November 15, 2000.[22] The Debtor conceded that they had discussed whether a lawsuit should be filed, but he stated that it was simply one option being considered at the time. The Debtor also determined that there were no grounds under California law to obtain a temporary restraining order from a court.

From this Court's perspective, it is clear that the Debtor provided legal advice to the Plaintiff and Ms. Robertson. Both Robertsons testified that they each provided funds for the retainer given to the Debtor. Each of the Robertsons also completed a loan application so that the Debtor could obtain new financing for the Property. The Debtor offered no plausible explanation for only having the Plaintiff execute the retainer agreement. The Debtor conceded that he received $2,700, not $2,500, as a retainer for legal services to be performed. The Debtor stated that the retainer was earned by the time he received it given all of the preliminary work that he did prior to his first meeting with the Plaintiff and Ms. Robertson.

Apparently the Debtor determined that the Plaintiff and Ms. Robertson were

---

**22.** The Debtor also insisted that the Plaintiff had advised him that she had graduated from law school. The Plaintiff denied this statement. The Court concludes that there is no credible evidence in the record that the Plaintiff made such a statement.

10

delinquent on the loans concerning the first and second lien on the Property and that he needed

to stop the foreclosure on November 15, 2000, as the first priority. He testified that he also

learned that the Plaintiff and Ms. Robertson were delinquent in the payment of their real property

taxes and that a tax sale had already occurred under California law. He also learned that the

Robertsons' mother and sister had died, but the title on the Property listing them as joint tenants

had not been corrected. The Debtor determined that the best course of action was to obtain a

five-year, interest-only loan to pay off the first and second liens and the delinquent taxes, with a

new payment of approximately $1,400 per month. He hoped that the Robertsons could sell or

obtain new financing by the time the balloon payment of principal was due in five years.[23]

The Debtor testified that he immediately turned to the task of obtaining new

financing for the Robertsons. He visited the offices of American Home Loans, with whom he

had a business relationship, and stated that after a three-hour discussion, American Home Loans

declined to provide any assistance. The Debtor had requested an initial review of the

Robertsons' financial situation from American Home Loans, so that if it declined to provide

funding, it would not show up on the Robertsons' credit reports. The Debtor testified that City

Financial had had some problems with the Plaintiff, and as a result, it refused to provide new

funding or refinance its current obligation with the Robertsons. City Financial had been making

some advances to the first lienholder on the Property, attempting to keep the first lien current.

However, the Debtor stated that by November 2000, both the first and second mortgage lien

obligations were in default.

The Debtor ultimately placed the loan with Mr. Prather, who was a principal of

FHL. The Debtor testified that he had never met Mr. Prather, that he had simply learned about

him through one of his contacts. This testimony is not credible nor consistent with the Debtor's

statement that he was an expert in the real estate foreclosure workout market and is not

---

**23.** The Debtor testified that he believed that the Robertsons had "a couple hundred
thousand" in equity in the Property in November 2000.

11

consistent with the Robertsons' testimony that the Debtor stated that Mr. Prather was a friend. Given the Court's review of the evidence and the quick placement of the Robertsons with Mr. Prather and FHL, the Court concludes that the Debtor did have a business relationship with Mr. Prather as previously noted earlier in this opinion.

The Debtor also testified that he reviewed all of the loan documents that FHL prepared for the Robertsons and that he told the Plaintiff that there were no problems with them. He also stated that he had executed the retainer agreement with the Plaintiff. However, there is nothing in the retainer agreement, the loan documents, or any other evidence presented to the Court which reflects that the Debtor terminated his representation of the Robertsons, as he described at trial, when "he found a lender, or arranged the loan" for the Robertsons. He never sent a letter to the Debtors stating that the representation terminated with his finding FHL as the lender, and there is no credible evidence from the Debtor that his representation of the Debtors ceased in November 2000. Thus, it was reasonable for the Robertsons to continue to rely on the Debtor to review and analyze the loan documents and to represent them concerning the closing of the loan transaction with FHL. Indeed the evidence reflects that the Plaintiff even paid the Debtor $500, the balance due the Debtor under the retention agreement on November 15, 2000, the day after the loan closing with FHL.[24]

The Debtor also inserted himself into his relationship with the Robertsons, not just as their lawyer, but also an individual who had contacts in the real estate industry and who was a real estate broker under California law. He would be able to refinance the liens on the Property or obtain new financing in a short period of time because of his expertise in stopping foreclosures. In essence, the Court concludes that the Debtor was not just serving as their lawyer, but also as an expert in real estate issues, who could place their financing or sell their Property at a later date. The Debtor also refused to file any lawsuit on the Robertsons' behalf. However, although the Robertsons may have misunderstood or misinterpreted the nature of their

---

**24.** Exhibit A-4.

12

claims against third parties or desired to sue improper parties, it was clear that the Robertsons did have a number of viable claims, under state and federal law, which the Debtor ultimately refused to pursue.

In early January 2001, the Plaintiff had been calling the Debtor on a number of occasions, frantic about the default under her new financing with FHL. She had received a number of calls from a Mr. Biddle, advising her that he represented Old Codgers, the note- and lien-holder on her Property, and she could not understand why he was calling her or why he alleged that the new financing was in default. The Debtor testified that Mr. Biddle had also called him around the same time, which reflects that the Debtor knew in early January 2001 that the Robertsons were still relying on him to serve as their attorney.

On January 19, 2001, the Debtor had his final meeting with the Robertsons. There is no doubt in this Court's mind that the January 19, 2001 meeting between the Debtor and the Robertsons was chaotic and emotional. The Plaintiff started yelling at the Debtor during the course of the meeting, and the Debtor, perhaps with a certain level of frustration, told her to "sit down and shut up." At the meeting, the Debtor made it clear that he would no longer represent the Robertsons, and that he believed that no lawsuit could be filed on their behalf because they had no viable claims against Old Codgers, FHL, Mr. Prather, Alliance, City Financial, or Mr. Rose, the principal of City Financial. The meeting ended fairly shortly thereafter, but even the Robertsons knew at that point that the Debtor no longer represented them. The Court concludes that the attorney-client relationship between the Debtor and the Robertsons was terminated on January 19, 2001.

Unfortunately, the Robertsons were correct to wonder why their loan was in default so quickly. The evidence reflects that the December 1, 2000 payment under the new loan provided by FHL was paid out of escrow.[25] The January 2001 payment was made by the Robertsons by endorsing over the escrow check made out to them by FHL, in the amount of

---

**25.** Exhibits F-5, F-8, and F-9.

13

$1,246.75,[26] and by making a separate payment to FHL[27]. On February 1, 2001, the Robertsons made a third payment of $1,434.38, which was endorsed by Old Codgers and placed in its account. Thus, the Court can see no basis for Mr. Biddle, FHL, or Old Codgers to notify the Debtor that the Robertsons were in default prior to the January 19, 2001 meeting that he had with the Plaintiff and Ms. Robertson.

There are a number of problems with the FHL escrow documents. Ms. Diane Fisher served as the escrow officer for FHL as to the new financing provided to the Robertsons.[28] However, she also served as the notary for Mr. Prather, President of FHL, when FHL assigned the note and deed of trust to Old Codgers on February 2, 2001.[29] On November 20, 2000, almost immediately after the Robertsons' loan closed, Ms. Fisher also apparently sent a letter to the Robertsons, notifying them that the loan had "been assigned to Old Codgers Corporation for servicing, with the payments to be made payable to Old Codgers Corporation.[30] Why would FHL immediately assign servicing of the loan from itself to Old Codgers? Why does the November 20, 2000 letterhead of FHL Financial Group have a different style and font from the letterhead utilized by FHL on November 16, 2000, in a prior letter that it sent to the Robertsons a few days earlier?[31] As to the chain of title, it reflects that FHL did not immediately assign its interest in the note and deed of trust to Old Codgers. The actual assignment was executed by Mr. Jeffrey Prather, as the President of FHL, on February 2, 2001, with an effective date of

---

**26.** Exhibit 33, Closing Statement at 1, under listing of "net proceeds," *also see* cashier's check from FHL, payable to the Robertsons, as the end of Exhibit 33 and exhibit 38.

**27.** Exhibit 38.

**28.** Exhibit 33, first page.

**29.** *See* n.37, *supra.*

**30.** Exhibit K.

**31.** Compare Exhibit 33, first page, with Exhibit K.

14

January 31, 2001, well after the second payment was due to FHL on January 1, 2001.[32]  The

Assignment was not recorded until February 5, 2001.[33] And Ms. Diane Fisher, the escrow officer

for the closing with the Robertsons, was the notary on the Assignment.[34]  Of course, the

Robertsons testified that they did not receive notice of the assignment to Old Codgers in January

2001 and did not receive the letter from FHL dated November 20, 2000.  From the Court's

standpoint, since the Debtor reviewed the escrow documents and was still serving as the

Robertsons' attorney in November 2000, he should have followed through concerning the

closing of escrow and to whom the Robertsons should have made payments on the loan.  This he

did not do.


D.  Factual Findings Concerning the Refinancing

        Based upon the evidence presented, and the testimony of the Robertsons and the

Debtor, the Court concludes that the Debtor contacted Mr. Prather, with whom he had a business

relationship, to assist in the refinancing of the secured obligations on the Property.  Mr. Prather

was apparently a mortgage broker and was a principal of FHL Financial Group ("FHL"), a

licensed real estate broker and the "escrow holder" for the refinancing.[35]  FHL agreed to assist

the Robertsons, provided that they execute a hold harmless agreement which would absolve FHL

of any "loss" that might occur as a result of the foreclosure sale of the Property.[36]  Under the

"borrower loan escrow instructions," dated November 10, 2000, the Robertsons agreed to deliver

---

**32.** Docket Entry No. 143, also *see* Exhibit 34.  Note that the Assignment is dated as
January 31, 2001, on Page 1, but the notary states that Mr. Prather did not appear before her until
February 2, 2001.  Arguably, the effective date would be February 2, 2001, when Mr. Prather
acknowledged his signature before the notary.

**33.** Id.

**34.** Id. at 2.

**35.** Exhibit F-1, at 1.  FHL was not a "public escrow service."

**36.** Exhibit F-12.

15

the note and deed of trust concerning the refinancing on the Property to FHL, which documents were to be provided to the lender at the time that the Robertsons received the funds of $127,500.[37] The interest rate on the refinancing was to be at the rate of 13.500 percent per annum,[38] with interest-only monthly installments of $1,434.38. The interest-only payments were to continue for a period of five years, and then a balloon payment in the amount of $128,934.38 would then be due and payable.[39] The refinancing was also to have a late charge of $25 or 10 percent of the delinquent payment, whichever was larger.[40] The Robertsons agreed that FHL was to make certain payments at the close of escrow, including any and all taxes and a commission to the broker. FHL also had the option to use the loan proceeds to bring the existing loans current.[41] The escrow instructions provided that the lender for the new financing had the right to assign its interest in the note and deed of trust, which created a lien on the Property, to another party without the consent of the Robertsons.[42] Of concern to the Court is the disclosure that the Robertsons were to be charged a "commission or loan origination fees" in the amount of $22,950.[43]

The Mortgage Loan Disclosure Statement, which listed FHL as the broker, also provided that the liens against the Property were to Alliance, in the amount of $52,000, and to

---

**37.** Id. at 1.

**38.** Exhibit F-2. The Declaration of Oral Disclosures reflected that this was an effective interest rate of almost 19.459 percent.

**39.** It appears that the first interest-only payment under the Note was financed as well, increasing the principal amount of the Note from $127,500 to $128,934.38 at maturity.

**40.** Exhibit F-1, at 2. The Declaration of Oral Disclosures reflected that the Robertsons would have a late charge of $143.43. Exhibit F-2.

**41.** Id. at 2-3.

**42.** Id. at 4, paragraph 17.

**43.** Exhibit F-2.

16

"Rose Financial," which was also apparently known as City Financial, in the amount of $44,000. These liens were to be paid in full, and a new lien in the amount of $127,500 was to be placed against the Property.[44]  An escrow fee of $450, a title insurance policy fee of $450, and a document and processing fee in the amount of $750 were also charged.  A loan origination fee in the amount of $22,950, was paid to FHL,[45] $96,000 was paid to discharge the Alliance and Rose (City) Financial liens against the Property, and the sum of $6,434.38 was paid to release the real estate taxes due and owing against the Property and to capitalize the first payment due and owing under the new loan.[46]

The Federal Truth-in-Lending Disclosures tracked the same disclosures noted above, advising the Robertsons that they had an effective interest rate of 19.4594 percent per annum, that they were obtaining the amount of $101,915.62 in new funding, that this credit would "cost" them $110,212.80 over the term of the loan as a finance charge, with the total payments to be made by the Robertsons at the end of five years, with the balloon payment, of $212,128.42.[47]  Rather than note the loan origination fee, the Disclosures stated that the sum of $25,584.38 was being paid as a "prepaid finance charge."

The note and deed of trust, in favor of FHL, as the lender, were executed by the Robertsons, and the Deed of Trust was recorded against the Property on November 14, 2000. Lenders T.D. Service, Inc., was listed as the Trustee.[48]

E.  The Testimony of Angela Swailes

---

**44.** Exhibit F-5.

**45.** Exhibit 33, Closing Statement at 1, described as "loan origination fee."

**46.** Exhibits F-5, F-6, F-7, F-8.

**47.**  Exhibit F-9.

**48.** Exhibit H.

17

On January 9, 2008, the Debtor called Ms. Swailes, out of order, in support of his case. Ms. Swailes was then employed by Pacific Northwest Title of Oregon, in Portland, Oregon, and came at the Debtor's request. She testified that she had been an escrow officer for over 20 years, that she had no connection with the case, but that she had reviewed the chain of title for the Property. She also testified that she had served as an escrow officer in California and that she was familiar with all phases of residential, commercial, and bulk sales of real property, including title issues. The Court questioned the Debtor as to whether Ms. Swailes was being called as an expert witness, and if so, had that been disclosed to the Plaintiff. The Debtor stated that Ms. Swailes was not being called as an expert witness, simply as a fact witness to assist the Court, as the fact finder, with the interpretation of certain documents in the chain of title. Ultimately Ms. Swailes' testimony was of more value in answering the questions or concerns of the Plaintiff. The Court concludes that Ms. Swailes' testimony shall be considered as that of a fact witness only.

Ms. Swailes, at the request of the Debtor, reviewed certain documents as a part of the chain of title.[49] Ms. Swailes reviewed a document recorded December 20, 2000, which was entitled "Substitution and Full Reconveyance."[50] She stated that Mr. Rose had executed the document in his capacity as Vice President of City Financial. The document reflected that the 1998 Deed of Trust of City Financial had been paid in full and that City Financial had substituted itself as the Trustee for the original trustee, North American Title Co., to accept full payment of the obligations thereunder and to reconvey the Property to the Robertsons, as Trustors. She noted that someone would have prepared a payoff amount for City Financial and that amount would have been paid in full at the time of the execution of the Substitution and Full Reconveyance. The Court concludes that this document was executed by City Financial to release its interest in the Property at the time the Robertsons obtained their new financing in

---

**49.** Docket Entry No. 143 in this Adversary Proceeding.

**50.** Docket Entry No. 143, Exhibit 31 thereto.

18

1    November 2000.[51]

2         She also reviewed another document, an affidavit dated November 14, 2000,

3    reflecting the death of a joint tenant.[52]  The document stated that after the affidavit was recorded,

4    a copy of same was to be sent to the Debtor.  The affidavit changed how the Property was held

5    by the remaining joint tenants, Ms. Robertson and the Plaintiff.  Also on November 14, 2000, a

6    Deed of Trust and Assignment of Rents was executed, which (1) listed a lien of record in favor

7    of City Financial concerning a promissory note in the amount of $127,500, (2) set forth the

8    incorrect address of the Property in the body of the Deed of Trust, but also listed the correct legal

9    description for the Property therein, (3) stated that Ronna Robertson, the Plaintiff, and Alexandra

10   Robertson were the trustors, and (4) listed Lenders TD Service, Inc., as the Trustee.[53]

11        Reviewing an earlier recorded document in the chain of title, she noted that at one

12   point in time North American Title had been listed as the trustee, that City Financial was the

13   lender, and that John N. Rose acted on behalf of City Financial.[54]

14

15   F.  Other Factual Findings Concerning the Chain of Title

16        The parties requested that Docket Entry No. 143, the chain of title, be admitted

17   into the evidence.[55]  The Court, as the trier of fact, is in as good a position as any factual witness,

18   _____

19        **51.** The fact that the document was not recorded until December 20, 2000 is not an issue
     for the Court.  There is usually some delay concerning the recordation of the release of a lien.
20

21        **52.** Docket Entry No. 143, Exhibit 29 thereto.  The Plaintiff insisted that this affidavit
     was invalid, since she did not execute Mr. Denton's notary journal.  The Plaintiff, therefore,
22   believed that the affidavit was improper under California law.  The Plaintiff was to testify further
     as to this point and did not.  However, as reflected herein, even if the affidavit was invalid, it
23   does not alter this Decision.

24        **53.** Docket Entry No. 143, Exhibit 30 thereto.

25        **54.** Docket Entry No. 143, Exhibit 20 thereto.

26        **55.** The chain of title documents were not admitted into evidence; however, the Court
27   may, and did, take judicial notice of the those items on its own Electronic Docket. In re E.R.

28                                              19

1  such as Ms. Swailes, to review the record and make certain factual findings therefrom.

2          On June 16, 2000, a Notice of Default and election to Sell Under Deed of Trust

3  was recorded.[56]  It appears that the default under the Alliance loan was cured by City Financial,

4  since a Notice of Rescission of Declaration of Default and Demand For Sale and Notice of

5  Default was recorded on July 19, 2000.[57] Therefore, what remained due and owing to City

6  Financial was $7,549.00.[58] One of Ms. Robertson's concerns was that Wells Fargo had acted

7  with Alliance and City Financial to somehow get a lien on her property from 1998-2000.

8  However, the Court has reviewed the Assignment of Deed of Trust[59] and it appears to reflect that

9  City Financial, in an unrelated transaction, had assigned all, or part, of its beneficial interest in

10 the Robertson note and deed of trust to Wells Fargo as security for a loan obtained by City

11 Financial. The Assignment by Wells Fargo appears to be a transfer back of this interest.  In any

12 event, the Court concludes that this Assignment of the Deed of Trust did not have an impact on

13 the Robertsons.

14          On April 18, 2001, a Notice of Default and Election of Trustee's Sale was

15 recorded against the Property by Lenders T.D. Service, Inc., which had the same address and

16 suite number as FHL and was the Trustee under the November 2000 new loan transaction

17 between FHL and the Robertsons.[60]  The Notice reflected an aggregate amount of $3,038.32 due

18 and owing to Old Codgers Corporation as of April 17, 2001.  Mr. Prather, now as President of

19

20

21 Fegert, Inc., 887 F.2d 955 (9th Cir. 1989).

22          **56.** Docket Entry No. 143, exhibit 23 thereto, *also see* the Plaintiff's separate Exhibit 12.

23
          **57.** Docket Entry No. 143, exhibit 26 thereto, *also see* Plaintiff's separate Exhibit 15.
24
          **58.** Docket Entry No. 143, exhibit 25 thereto.
25
          **59.** Docket Entry No. 143, exhibit 27 thereto.
26

27          **60.** Docket Entry No. 143, exhibit 34 thereto, *also see* the Plaintiff's separate Exhibit 51.

28                                              20

Lenders T.D. Service, Inc., executed the Notice.[61]  Given the monthly payments of $1,434.38,

interest only, the Robertsons could have missed paying the March and April payments and been

in default to Old Codgers in that approximate amount as of April 17, 2001.

On September 28, 2001, a Notice of Rescission concerning a Trustee's Sale was

filed by Lenders T.D. Service as Trustee as to the November 14, 2000 Deed of Trust.[62]  Mr.

Prather again acted as President of Lenders T.D. Service. [63]

On February 20, 2002, Lenders T.D. Service filed yet another Notice of Default

and Election of Trustee's Sale, with Mr. Prather as its President, alleging a default of the Old

Codgers Deed of Trustee in the amount of $3,424.32 as of February 19, 2002.[64]

On June 20, 2002, a Trustee's Deed Upon Sale, transferring the Property, was

recorded,  which reflected that the Property was sold for $310,100.  The amount of the liens

against the Property was the sum of $144,434.61.  Lenders T.D. Service was listed as the

Trustee, and Old Codgers was listed as the beneficiary/lender.[65]

---

**61.** The very same Mr. Prather, who was President of FHL and had provided the funding to the Robertsons, assigned the note and deed of trust of the Robertsons to Old Codgers as of February 2, 2001.

**62.** Docket Entry No. 143, exhibit 36 thereto, *also see* Plaintiff's separate Exhibit 58.

**63.** In reviewing the Notice, its not clear to the Court what exactly was going on since pursuant to Docket Entry No. 143, exhibit 32 thereto, FHL Financial Group had assigned its interest to Old Codgers as of January 31, 2001 (recorded February 5, 2001), and yet the Notice had FHL Financial Group as the "beneficiary" under the Deed of Trust.

**64.** Docket Entry No. 143, exhibit 37 thereto, *also see* the Plaintiff's separate Exhibit 59.

**65.** Docket Entry No. 143, Exhibit 38 thereto, *also see* the Plaintiff's separate Exhibit 62. In further review of the Trustee's Deed, there is some confusion concerning what was transpiring.  The Trustee's Deed Upon Sale refers to both the Deed of Trust executed on November 11, 2000 by FHL Financial Group and a Deed of Trust executed by Old Codgers on February 20, 2001.  The February 20, 2001 "Deed of Trust," was a not a Deed of Trust, but rather a Notice of Default and Election to Sell Under Deed of Trust. However, the ultimate result, that a trustee's sale occurred, is not altered by the somewhat confusing language.

21

## III. LEGAL ISSUES

A.  Whether the Debtor made any false representations to the Plaintiff when he obtained the new financing on the Property which would warrant deeming any debt due and owing to the Plaintiff nondischargeable under 11 U.S.C. §523(a)(2)(A).

B.  Whether the Plaintiff has a nondischargeable debt against the Debtor for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. §523(a)(4).

C.  Whether the Plaintiff has timely brought her action under Sections 523(a)(2)(A) or 523(a)(4); that is, whether the Plaintiff's claims would now be barred under applicable state law.

## IV. DISCUSSION

A.  Whether the Debtor made any false representations to the Plaintiff when he obtained the new financing on the Property which would warrant deeming any debt due and owing to the Plaintiff nondischargeable under 11 U.S.C. §523(a)(2)(A).

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud."  In the Ninth Circuit, to prove nondischargeablity under §523(a)(2)(A), the Plaintiff  needs to show that "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Sabban, 384 B.R. 1 (9th Cir. BAP 2008); In re Diamond, 285 F.3d 822 (9th Cir. 2002); In re Slyman, 234 F.3d 1081 (9th Cir. 2000); In re Ettell, 188 F.3d 1141, 1144 (9th Cir. 1999); In re Hashemi, 104 F.3d 1122, 1125 (9th Cir. 1996); In re Eashai, 87 F.3d 1082 (9th Cir. 1996).  The Plaintiff must establish the nondischargeability of a debt  by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991).

For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor  In re Tsurukawa, 258 B.R. 192 (9th Cir. BAP 2001).  However, direct

evidence of an intent to deceive is rarely shown.  Hence, intent may be "inferred and established from the surrounding circumstances." In re Hultquist, 101 B.R. 180 (9th Cir. BAP 1989); In re Anastas, 94 F.3d 1280 (9th Cir. 1996); In re Dakota, 284 B.R. 711 (Bankr.N.D.Cal. 2002).  The court must consider whether the totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor.  In re Basham, 106 B.R. 453, 457 (Bankr.E.D.Va.1989). Because no single objective factor is dispositive, the assessment of intent is, thus, left to the fact-finder. In re Jacks, 266 B.R. 728 (9th Cir. BAP 2001).  The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

Here, the Plaintiff testified that she believed that the Debtor had misrepresented the temporary nature of the loan; that is, she believed that she was obtaining long-term financing that would resolve the financial difficulties of her and her sister.  But the evidence is overwhelming that the Robertsons first met with the Debtor when they were facing a trustee's sale of their Property within a two-week period of time.  They knew that they needed to act promptly  to save the Property, with the long-term financing, the sale of the Property, or the potential litigation against third parties to occur at a later date.  The Plaintiff and Ms. Robertson were delinquent on the Alliance and City Financial obligations, the consensual liens against the Property, and with respect to the payment of real estate taxes.  The Robertsons needed to stop the trustee's sale of the Property scheduled for November 15, 2000.  The Robertsons were also provided with a series of Truth-in-Lending and other disclosures which clearly reflected the short-term nature of the financing.

The Debtor testified that he attempted to procure financing from American Home Loans, which was denied. Additionally, City Financial, the second lienholder, refused to refinance the obligation.  As a result, the Court concludes that the Debtor did advise the Plaintiff and her sister that a five-year interest only loan, with a balloon payment, was the only viable alternative to avert an imminent trustee's sale of the Property.  The Debtor advised the Robertsons that if the financing were obtained at least the Robertsons would have at least five

23

years to determine their next course of action, such as selling or obtaining long-term financing on Property. Therefore, the Court concludes that the Debtor did not misrepresent the temporary nature of loan and that there is no basis to deem the debt nondischargeable, under Section 523(a)(2)(A) based upon said allegation.

The Plaintiff also alleged that the Debtor misrepresented the nature of the legal services that he would perform. The Debtor, a California attorney, would be required to conform his conduct to the rules, statutes, and case law then in place in California as to attorneys. In re Miller, 292 B.R. 409 (9th Cir. BAP 2003); In re Kang Jin Hwang, 396 B.R. 757 (Bankr.C.D.Cal 2008). According to the Plaintiff, the Debtor promised to file a lawsuit, and he never took that action. Based upon the evidence, it is clear that the Debtor provided legal advice to both the Plaintiff and Ms. Robertson. While the retainer agreement was only signed by the Plaintiff, based upon the totality of the circumstances, the Court concludes that the Debtor undertook the representation of the Plaintiff and Ms. Robertson, whose interests were aligned with the Plaintiff. An attorney-client relationship is created, in California, by some form of contract, express or implied, formal or informal. Fox. v. Pollack, 181 Cal. App. 3d 954 (1st Dist. 1986). It is the intent and conduct of the parties that controls the question as to whether an attorney-client relationship has been created. Zenith Ins. Co v. Cozen O'Connor, 148 Cal. App. 4th 998 (2nd Dist. 2007); Responsible Citizens v. Superior Court, 16 Cal. App. 4th 1717 (5th Dist. 1993). Here, both the Plaintiff and Ms. Robertson met with the Debtor to discuss possible options to stop the trustee's sale of the Property. In addition, both Robertsons provided funds for the retainer and both completed loan applications to obtain new financing.

The retainer agreement signed by the Plaintiff and the Debtor outlines the general nature of the services to be performed, including the filing of a lawsuit. However, in any matter for which the attorney has been retained, the attorney must investigate the facts, analyze the law, and determine whether a lawsuit is appropriate given the ethical constraints controlling the conduct of an attorney. Although a review of the facts reflects that the Debtor was grossly

24

negligent in his representation of the Plaintiff and Ms. Robertson, such conduct is not sufficient to support a claim for relief under 11 U.S.C. § 523(a)(2)(A). As the Court has previously stated, and will further address, the Robertsons appeared to have a number of viable claims under state and federal law concerning the financing that they obtained in November 2000. The Debtor, as an expert in real estate and foreclosure issues, should have known of these claims and pursued them for the Plaintiff and Ms. Robertson. If he were unable to represent the Robertsons because of the Plaintiff's conduct or the Robertsons' inability to pay him any further compensation, he should have, at the time that he terminated the attorney-client relationship in January 2001, at least notified them of the potential claims that they had. At the January 19, 2001 meeting, and based upon the statements made by the Robertsons at the time, he should have known that the almost immediate default under the new financing was potentially suspect, given that the escrow instructions reflected that the Robertsons had made the December loan payment at the close of escrow in November 2000. As the Robertsons' counsel, on notice of discrepancies and inconsistencies of the refinancing deal, he should have taken some action on their behalf or at least advised them, when he terminated the representation, that there were some problems with the refinancing that needed to be explored. But his failure to act does not rise to the level of scienter that is required for a nondischargeability claim under Section 523(a)(2)(A).

Therefore, the Court concludes that the Robertsons had potential claims that could have been pursued as a result of the FHL financing. However, it appears that the Debtor failed to understand the legal issues and appropriately represent the Plaintiff and her sister. This gross negligence by the Debtor, however, does not amount to fraud or a "false representation" for Section 523(a)(2)(A) purposes.

       B. Whether the Plaintiff has a nondischargeable debt against the Debtor for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. §523(a)(4).

Section 523(a)(4) provides that an individual debtor is not discharged from any

debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In the Ninth Circuit, to prevail on a complaint under this Subsection, the creditor must establish three elements: (1) an express trust;[66] (2) that the debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. In re Jacks, 266 B.R. 728 (9th Cir. BAP 2001); In re Bigelow, 271 B.R. 178 (9th Cir. BAP 2001).

The question of whether a fiduciary relationship exists for purposes of Section 523 (a)(4) is one of federal law. In re Cantrell, 329 F.3d 1119, 1125 (9th Cir.2003); Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir. 1986). When determining the fiduciary relationship issue, the courts should consult state law. Id. The broad-based, general definition of fiduciary is not applicable in the context of an exception to discharge under Section 523(a)(4). In re Lewis, 97 F.3d 1182, 1185 (9th Cir. 1996). Not all fiduciary capacities or relationships recognized by state law will be found sufficient for Section 523(a)(4) purposes. Cantrell at 1125-26. In this matter, because all actions between the parties occurred in California, and the Debtor was a licensed California attorney and real estate broker at the time, California law should be consulted by the Court concerning the fiduciary relationships created. In re Abrams, 229 B.R. 784 (9th Cir. BAP 1999); In re Stanifer, 236 B.R. 709 (9th Cir. 1999).

1. Attorney Relationship

Pursuant to an Attorney's Fees and Costs Agreement executed by both the Debtor and Plaintiff on November 1, 2000, the Debtor agreed to represent the Plaintiff as legal counsel in relation to the Property and the impending trustee's sale.[67] In the retainer agreement, the Debtor stated that he had received a payment of $1,000 from the Plaintiff, that the retainer was "nonrefundable," and that he would represent the Plaintiff "through to a conclusion of [the] case

---

**66.** The express trust must be created prior to, and separate from, any alleged wrongdoing. *See* In re Lewis, 97 F. 3d 1182, 1185 (9th Cir. 1996), citing Ragsdale, [T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt."

**67.** Exhibit 23.

26

by entry of a judgment."[68]  The Debtor stated that his services would consist of "preparation of all legal documents for court proceedings and/or settlement agreement, conferences, consultations with [the Plaintiff] and accountants, appraisers, actuaries, real estate brokers and other persons necessary to a resolution of any issues raised during the proceedings, telephone conferences, legal research, and correspondence."[69]  The agreement also provided that the Plaintiff was to pay an additional $1,500 within two weeks of the November 1, 2000 date of the agreement.[70]  The evidence reflects that the Robertsons paid the sum of $1,000 and $700 on November 8, 2000; $500 on November 13, 2000; and $500 on November 15, the day after the new financing was obtained for the Property.[71]  Thus, the Court concludes that the Robertsons paid $2,700, although the retainer agreement provided for the payment of $2,500.

Under Section 523(a)(4), the Ninth Circuit requires that a debtor must have been a trustee, in the strict or narrow sense, through an express or technical trust. Banks v. Gill Distribution Centers, Inc., 263 F.3d 862 (9th Cir. 2001). Whether a fiduciary is the trustee of an express trust depends on state law, and an express trust may be imposed by common law. In re Lewis, 97 F.3d 1182, 1185-86 (9th Cir. 1996) (holding that Arizona case law imposes an express trust on partners). A general fiduciary duty of confidence, trust, loyalty, and good faith is insufficient to establish a relationship for purposes of nondischargeability. In re Tallant, 207 B.R. 923 (Bankr. E.D.Cal 1997) *aff'd* in part, *rev'd* in part on other grounds, 218 B.R. 58 (9th Cir.BAP 1998); In re Young, 91 F.3d 1367 (10th Cir. 1996). Therefore, the attorney-client relationship by itself does not establish a fiduciary relationship for the purposes of Section 523(a)(4). However, a general fiduciary, attorney-client relationship may rise to the level of a

---

**68.** Exhibit A-1.

**69.** Id.

**70.** Id.

**71.** Exhibit A-2, A-3, A-4.

27

fiduciary relationship for purposes of Section 523(a)(4) if there are client trust funds involved. In re Bigelow, 271 B.R. 178 (9th Cir. BAP 2001); In re Gasster, 301 B.R. 568 (Bankr. N.D. Cal. 2003)(holding that a fiduciary relationship was not created since there were no trust funds involved); Braud v. Stokes (In re Stokes), 142 B.R. 908, 910 n.3 (Bankr. N.D. Calif. 1992)(holding that the professional rule as to trust funds is the sole exception to the general statement that no California statute elevates the attorney-client relationship to one of trustee-beneficiary status).

In this case, the Court concludes that the Debtor provided legal advice to the Plaintiff and Ms. Robertson, and that an attorney-client relationship was created. However, the Plaintiff and Ms. Robertson provided the Debtor with a retainer, not client trust funds.[72] At no point was the Debtor requested to hold and manage funds on behalf of the Robertsons. Therefore, since there were no trust funds involved in the Debtor's attorney-client relationship with the Plaintiff and Ms. Robertson, the Court is unable to find a fiduciary relationship that was created within the narrow meaning of Section 523(a)(4).

## 2. Real Estate Broker Relationship

Under California law, if a debtor acts within the scope of his real estate broker's license, a fiduciary relationship arises between the debtor and his clients, and any judgment for fraud or defalcation is nondischargeable under Section 523(a)(4). *See* In re Woosley, 117 B.R. 524, 529 (9th Cir. BAP 1990); Bugna v. McArthur (In re Bugna), 33 F.3d 1054, 1057 (9th Cir.1994). The Ninth Circuit Bankruptcy Appellate Panel has held that Cal. Bus. Pro. Code § 10131 creates a fiduciary relationship between a real estate broker and his clients for Section

---

**72.** While it is true that the Plaintiff and Ms. Robertson actually paid $2,700, rather than the $2,500 requested as a retainer, the Debtor testified that he had rendered substantial services to the Robertsons by the time of the final payment on November 15, 2000. Moreover, the Debtor also met with the Robertsons on January 19, 2001, for which he received no compensation. In any event, there is nothing in the record which reflects that the Debtor held the funds in trust.

28

523(a)(4) purposes.[73]  Woosley at 529; In re Rodriguez, 110 F.3d 69 (9th Cir. 1997). In the

Woosley decision, the Panel held:

> [The debtor's] real estate license carries with it fiduciary obligations to his principals under California law when carrying out licensed activities. With respect to licensed activities, real estate licensees have the same obligations as trustees under California law, including duties to refrain from making misrepresentations or obtaining any advantage over their principals, and to make the fullest disclosure of all material facts concerning the transaction that might affect their principal's

> decision.

Woosley at 529.

The Court finds that the evidence presented clearly shows that the Debtor not

only had an attorney-client relationship with the Plaintiff and Ms. Robertson, but he also acted as

---

**73.** Cal.Bus. & Prof.Code § 10131 (West 2008) provides as follows:

A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity.

(b) Leases or rents or offers to lease or rent, or places for rent, or solicits listings of places for rent, or solicits for prospective tenants, or negotiates the sale, purchase or exchanges of leases on real property, or on a business opportunity, or collects rents from real property, or improvements thereon, or from business opportunities.

(c) Assists or offers to assist in filing an application for the purchase or lease of, or in locating or entering upon, lands owned by the state or federal government.

(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity.

(e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property or on a business opportunity, and performs services for the holders thereof.

a "real estate broker" for them. The Debtor solicited lenders for the Plaintiff and Ms. Robertson to assist them in the refinancing of their Property. He attempted to obtain financing from American Home Loans, and when he was unable to procure that loan for the Robertsons, he placed the loan with Mr. Prather at FHL. Therefore, the Court finds that the Debtor's actions were within the parameters of Cal.Bus. & Prof.Code § 10131(d). As a result, a fiduciary relationship was created under California law between the Debtor and the Robertsons for purposes of Section 523(a)(4).

The Court has concluded that a technical trust was created under statutory law and that the trust was created prior to, and independent of, any defalcation. However, the Court must also find that a debt was created as a result of a defalcation by the Debtor. A defalcation has been defined as a misappropriation of trust funds or money held in any fiduciary capacity, or the failure to account properly for such funds. In re Hemmeter, 242 F.3d 1186 (9th Cir. 2001); In re Lewis, 97 F.3d 1182 (9th Cir. 1996); In re Baird, 114 B.R. 198 (9th Cir. BAP 1990).

One of the landmark cases on this issue is the Ninth Circuit decision of F.D.I.C. v. Jackson, 133 F.3d 694 (9th Cir. 1998). In Jackson, the Ninth Circuit held that a debtor need not have the intent to commit a fraudulent act to be denied a discharge under Section 523(a)(4). Id. at 703. "[D]efalcation, at least for the purposes of nondischargeability under Section 523(a)(4), includes any behavior by a fiduciary, including innocent, negligent and intentional defaults of fiduciary duty..." Thus, even innocent acts of failure to account fully for money received in trust will be held as nondischargeable defalcations; no intent to defraud is required. Id.; See *also* In re Short, 818 F.2d 693 (9th Cir. 1987); In re Baird, 114 B.R. 198 (9th Cir. BAP 1990). California law has enumerated the duties of the real estate broker as including the duty to refrain from a misrepresentation, the duty to refrain from obtaining any advantage over the principal, and the duty to make the fullest disclosures of all material facts concerning the transaction that may affect the principal's decision. Woosley at 529.

In this case, the Debtor failed to make the full disclosure of all material facts

30

concerning the loan with FHL. He directed the Robertsons to FHL, and he reviewed all of the loan documents prepared by FHL yet he failed to appreciate the many problems with the FHL loan. However, the Plaintiff must also show that some type of debt was created as a result of this defalcation that should now be deemed nondischargeable.

At the time of trial, the Court inquired of the Plaintiff, on numerous occasions, what damages she incurred as a result of the Debtor's actions. The Plaintiff could provide no evidence on this critical point. Part of the problem is that the Plaintiff and Ms. Robertson continued to reside at the Property for over a year and a half after the FHL loan closed before the Property was sold at a trustee's sale in June 2002.[74] It is impossible to hold the Debtor responsible for the ultimate foreclosure of the Property when it occurred so long after he terminated his representation of the Plaintiff and Ms. Robertson. The Court also finds that the Debtor never held any funds of the Plaintiff in his fiduciary role as a real estate broker. The Debtor did obtain funds as a part of his attorney's retainer agreement, but those were not trust funds, and they were not tied to his role as a real estate broker. The cases which the Court has reviewed on this point require that the debtor solicit funds from a creditor which are then loaned to a third party, with some type of mismanagement of funds entrusted with the real estate broker. It is the mismanagement of the funds received by the debtor, as a real estate broker, that results in a defalcation while acting in a fiduciary capacity, and it is the loss that is sustained by the creditor as a result of this defalcation that leads to the debt. *See* Bugna v. McArthur (In re Bugna), 33 F. 3d 1054 (9th Cir. 1994)(debtor took advantage of a business opportunity, returning the funds deposited with him by his partner, to the detriment of the partner); In re Woosley, 117 B.R. 524, 531 (9th Cir. BAP 1990)(creditor provided funds that the debtor utilized as a loan from the creditor to third parties, but debtor failed to record the deed of trust to secure the loan).

The evidence does not reflect that the Plaintiff ever provided any funds to the

---

**74.** The FHL loan closed on November 14, 2000. The Property was sold at a trustee's sale on June 20, 2002.

31

Debtor that he was to manage for the benefit of the Plaintiff and her sister. The Debtor did not receive any form of payment or benefit in his capacity as a real estate broker for the Plaintiff and her sister. Since there were no funds managed by the Debtor, as a part of his fiduciary relationship, as a real estate broker, the Court concludes that, by definition, there could be no defalcation, or a debt arising from a defalcation, for purposes of Section 523(a)(4). In re Bigelow, 271 B.R. 178 (9th Cir. BAP 2001). Accordingly, the Plaintiff has not carried the burden of proof on this issue.

C. Whether the Plaintiff has timely brought her action under Sections 523(a)(2)(A) or 523(a)(4); that is, whether the Plaintiff's claims would now be barred under applicable state law.

1. Statute of Limitations under Section 523(a)(2)(A).

As has been recognized by other courts, there are two distinct issues concerning the statute of limitations in a nondischargeability proceeding. First, the establishment of the debt is governed by the applicable state statute of limitations. If the suit is not brought within the time period allotted under state law, the debt cannot be established. Second, the question of the dischargeability of the debt under the Bankruptcy Code is a distinct issue governed solely by the limitations periods established by bankruptcy law. In re Banks, 225 B.R. 738 (Bankr. C.D.Cal. 1998) *citing* In re McKendry, 40 F.3d 331, 337 (10th Cir. 1994). In this case, the Debtor argues that the Plaintiffs actions under both Section 523 (a)(2)(A) and (a)(4) are time-barred by a three-year statute of limitations. The Debtor is incorrect.

With respect to Section 523(a)(2)(A),the Court must review the applicable state law for the establishment of the debt. In this case, since all actions between the parties occurred in California law, specifically, the California Code of Civil Procedure § 338(d) applies.[75] Said

**75.** West's Ann.Cal.C.C.P. § 338 (d) (West 2008) provides:

(d) An action for relief on the ground of fraud or mistake. The cause of action in that case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts

32

Section provides that fraud actions must be brought within three years and that "[t]he cause of action in that case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Cal.Civ.Proc.Code § 338(d) (West 2008).

In this case, the Plaintiff and Ms. Robertson executed the note and deed of trust at issue on November 10, 2000. A trustee's sale of the Property was conducted on June 20, 2002.[76] On June 19, 2002, the Plaintiff commenced a lawsuit in the Orange County Superior Court of California against the Debtor, and various individuals and entities involved in the financing of the Property in 2000.[77] The Plaintiff alleged that all of the parties, including the Debtor, engaged in fraudulent behavior with respect to the FHL November 2000 note and deed of trust. The Court has reviewed the record, and despite the Debtor's arguments to the contrary in his closing memorandum of law, the Court concludes that there is no evidence, in this record, that the case has been dismissed, or the Debtor, as a defendant therein, has been removed as a party. Therefore, for the purposes of this decision, the Court finds that the underlying Superior Court action was timely filed and is still pending.

Moreover, the establishment of the debt for statute of limitations purposes does not require the entry of a judgment on the debt. Even if the state statute of limitations for fraud, upon which the debt is predicated, has passed or "run" prior to the filing of the bankruptcy case, the debt is still deemed "established" pre-petition, if the creditor has taken a timely affirmative act which is necessary to the creditor's ability to collect the debt in a manner provided by law. Banks at 745. Therefore, it is not necessary for the Plaintiff to obtain a pre-petition state court judgment within the relevant statute of limitations; simply commencing the underlying court

constituting the fraud or mistake.

**76.** The Plaintiff was actually removed from the Property on July 24, 2002. *See* Exhibit W; Notice of Eviction.

**77.** Docket Entry No. 49, Exhibit 1.

33

1  action is sufficient. <u>Banks v. Gill Distribution Centers, Inc.</u>, 263 F.3d 862 (9th Cir. 2001).

2      Here, the Plaintiff commenced her fraud action against the Debtor in 2002, well

3  within California three-year statute of limitations for fraud. No evidence was presented to the

4  Court that the underlying Superior Court action was dismissed prior to the Debtor's bankruptcy

5  petition date or during the pendency of this adversary proceeding.

6      As to the second element related to the commencement of an action for

7  nondischargeability purposes, the only time period under federal law in which a creditor must act

8  under Section 523(a)(2)(A) is set forth in Federal Rule of Bankruptcy Procedure 4007( c), which

9  requires that the creditor file the complaint within 60 days of the first date set for the Section 341

10 meeting of creditors. In this case, the date by which creditors had to act, for purposes of Rule

11 4007( c), was October 30, 2006 .[78]  The Plaintiff filed her complaint on October 26, 2006, well

12 within the time constraints provided under the Rule.

13     As a result, the Court concludes that the Plaintiff filed her complaint in a timely

14 manner, and the statute of limitations, under state and federal law, has not expired as to the

15 523(a)(2)(A) claim.

16

17     2. Statute of Limitations under Section 523(a)(4).

18     Under the California statute of limitations, breach of fiduciary duty claims are

19 governed by California Code of Civil Procedure § 343. [79] Cal.Civ.Proc.Code § 343; <u>Buick v.</u>

20 <u>World Savings Bank,</u> 565 F. Supp 1152 (E.D. Cal. 2008);  <u>In re Banks</u>, 225 B.R. 738 (Bankr.

21

22     **78.** *See* Docket Entry No. 10, the Notice of Chapter 7 Bankruptcy Case, Meeting of
   Creditors, & Deadlines.

23

24     **79.** West's Ann.Cal.C.C.P. § 343 (West 2008) provides:

25     Actions for relief not hereinbefore provided for. An action for relief not hereinbefore
   provided for must be commenced within four years after the cause of action shall have
26    accrued.

27

28                                        34

C.D. Cal. 1998); <u>David Welch Co. v. Erskine & Tulley</u>, 203 Cal. App.3d 884, 250 Cal. Rptr. 339, 341 (Ct. App. 1988).

As noted above, the Plaintiff did commence a lawsuit against the Debtor in June 2002, alleging amongst other things, that the Debtor engaged in fraudulent conduct by intentionally or negligently misrepresenting certain facts with respect to the financing of the Property in 2000, as well as concealing and falsifying information, and concealing the amount of attorney's fees received in addition to the retainer paid by the Plaintiff. The Plaintiff also alleged that the Debtor failed to perform, no doubt in his capacity as her attorney, by failing to file a lawsuit to quite title and provide the Plaintiff with a chain of title for the Property. While all of the Plaintiff's allegations in the California Superior Court action were encompassed under the heading of "fraud," it is clear to the Court that in the crucible of her allegations, the Plaintiff alleged that the Debtor engaged in fraudulent behavior while acting as her fiduciary, or at a minimum, his behavior rose to the level of a defalcation while engaged as a fiduciary. Moreover, there is no requirement that the allegations of a complaint filed in state court prior to a debtor filing a bankruptcy petition in bankruptcy correspond to the elements of the grounds contained in 523(a) of the Bankruptcy Code. <u>In re Moran</u>, 152 B.R. 493 (Bankr. S.D.Ohio 1993); <u>Banks v. Gill Distribution Centers, Inc.</u>, 263 F.3d 862 (9th Cir. 2001). As a result, the Court concludes that the Plaintiff made a claim for breach of fiduciary duty with enough specificity in her California Superior Court complaint. Since the complaint was filed in 2002, the Plaintiff filed it well within the California four-year statute of limitations for beach of fiduciary duty claims. Therefore, the Court concludes that the statute of limitations has not expired as to the establishment of the claim for Section 523(a)(4) purposes.

As to any time period under federal law by which the Plaintiff must act, the only limitation is that the complaint must be filed in the bankruptcy court within 60 days of the first date set for the Section 341 meeting of creditors. Fed.R.Bankr.P. 4007( c). The date set for

filing Section 523(a)(4) complaints in this case was October 30, 2006.[80]   The Plaintiff filed her

complaint in this Court well before that time deadline.[81]

As a result the Court finds that the Plaintiff filed her complaint within the statute

of limitations required under state and federal law.  The Plaintiff's claim under Section 523(a)(4)

was not time barred.

V.  Conclusion

While the Court has determined that the Plaintiff has failed to meet her burden of

proof to establish a claim, against the Debtor, which is nondischargeable under Section

523(a)(2)(A) or Section 523 (a)(4), the Court acknowledges its concerns with the terms and

conditions of the FHL financing and the parties who engaged in that financing.  The Debtor

testified that he placed the loan with Mr. Prather, at FHL, with whom he had a business

relationship, and that he reviewed the loan documents and found them acceptable.  The Court

believes that various provision of federal law, at a minimum, were violated, such as the Truth-in-

Lending Act ("TILA") and an amendment thereto, The Home Owner's Equity Protection Act

("HOEPA").  15 U.S.C. § 1601 *et seq*. The law requires that certain disclosures be made,

including certain terms and admonitions regarding a "high cost mortgage."  <u>Morrison v.

Brookstone Mortg. Co., Inc.</u>, 415 F. Supp.2d 801 (S.D.Ohio 2005). A transaction secured by the

consumer's principal dwelling is considered a  "high cost mortgage" when the points and fees

exceed the greater of 8 percent of the total amount of the financing or $400.00. 15 U.S.C. §

1601(a)(a).[82]  When the points and fees exceed the amount specified above, there are required

---

**80.** *See* Docket Entry No. 10,   Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines.

**81.** As noted previously, the Plaintiff filed her complaint on October 26, 2006.

**82.** The points and fees are defined by the statute to include "(A) all items included in the finance charge, except interest or the time-price differential; (B) all compensation paid to the mortgage brokers; (C) each of the charges listed in section 1605(e) of this title (except an escrow

36

disclosures that must be made to the borrower for such a high cost mortgage.

TILA provides for penalties if the creditor fails to make these disclosures. 15 U.S.C. § 1604(a). A plaintiff would have to bring her suit within one year form the date of the occurrence of the violation.[83] In this case, the Mortgage Loan Disclosure Statement, which listed FHL as the broker, provided that the liens on the Property were to be paid in full, and a new lien in the amount of $127,500 was to be placed on the Property. A loan origination fee, or broker's fee, in the amount of $22,950 was paid to FHL. In addition, an escrow fee of $450, a title insurance policy fee of $450, and a document and processing fee in the amount of $750 were also charged. FHL also served as the initial lender on the transaction. Therefore, it appears that the origination fee, or broker's fee, received by FHL amounted to approximately 18 percent of the the loan amount. While it is not completely clear to the Court whether a TILA violation occurred, the amount of the fee and the fact that FHL was involved in so many capacities in the initial loan transaction cause the Court concern. Moreover, as a specialist in real estate issues, the Debtor, serving as legal counsel to the Plaintiff and Ms. Robertson until January 19, 2001, should have determined whether such a violation did occur.

The Court also has concerns regarding the potential violations of the Real Estate Settlement Procedures Act ("RESPA"). 12 U.S.C. § 2605. RESPA provides for certain disclosure requirements to be followed by the entities or persons responsible for servicing a "federally related" mortgage loan, including disclosures of any assignment, sale, or transfer of the loan. The statute requires that notice of a loan transfer must be given not less than fifteen

---

for future payment of taxes), unless–(I) the charge is reasonable; (ii) the creditor receives no direct or indirect compensation; and (iii) the charge is paid to a third party unaffiliated with the creditor; and (D) such other charges as the Board determines to be appropriate."

**83.** Furthermore, if the TILA disclosures are never made, there is a continuing right to rescind, which is not dependent upon the one-year statute of limitations period for a claim of damages. Mills v. EquiCredit Corp., 172 Fed. Appx. 652 (6th Cir. 2006). The continuing right of rescission expires three years after the date of consummation of the transaction, or upon the sale of the property, whichever occurs first. 15 U.S.C. §1635(f). Unfortunately for the Plaintiff in this case, the Property was sold on June 20, 2002, so the Plaintiff's right to rescind was vitiated.

days before the effective date of the transfer. 12 U.S.C. § 2605(a)(2)(A). RESPA also requires the loan servicer to respond to inquiries and complaints and make corrections within sixty days of the receipt of a "qualified written request." As a result of the violation of the statute, a plaintiff may recover her actual damages and certain additional damages. 12 U.S.C. § 2605(f). However, an action for violation of 12 U.S.C. § 2605 must be brought within three years from the date of the occurrence of the violation. In this case, the Plaintiff apparently tried to exercise her rights under RESPA by attempting to receive information from FHL and Old Codgers. There is nothing in the record to indicate that they complied in a timely manner. Unfortunately, it appears that the Plaintiff is now barred, by the statute of limitations, with respect to this claim. However, this is another example of a potential cause of action the Plaintiff might have had against other parties, not necessarily the Debtor.

The facts of this case are unfortunate. With the proper representation, the Plaintiff and her sister might have had viable claims against the various parties involved in the FHL refinancing. However, the evidence presented to this Court does not rise to the level of conduct which would result in a nondischargeable debt, in favor of the Plaintiff and against the Debtor, pursuant to Section 523(a)(2)(A) or Section 523(a)(4).

Based upon the foregoing, the Court concludes that the Plaintiff failed to establish all of the elements of §§ 523(a)(2)(A) and 523(a)(4). The Court concludes that any debt owed to the Plaintiff by the Debtor is discharged. The Court will execute a separate order incorporating this Memorandum Decision.

DATED this 17th day of February, 2009.

_Sarah Sharer Curley_

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

38